UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

TYRION McNAIR,

        Petitioner,

            v.                  CAUSE NO. 1:23-CV-22-HAB-SLC

WARDEN, et al.,

        Respondents.

## OPINION AND ORDER

Tyrion McNair, a prisoner without a lawyer, filed a habeas corpus petition under 28 U.S.C. § 2254 to challenge his conviction for murder and use of a firearm during the commission of a felony under Case No. 02D05-1807-MR-12. Following a jury trial, on February 1, 2019, the Allen Superior Court sentenced McNair to eighty-five years of incarceration.

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Court of Appeals of Indiana summarized the evidence presented at trial:

> Jabriel Vaughn, Joshua Smiley, and McNair grew up in the same neighborhood and have known each other for a long time. On March 31, 2018, they spent the day hanging out, smoking marijuana, and driving around in a silver Hyundai Sonata rented in Vaughn's name and paid for by McNair. That evening, Vaughn, Smiley, and McNair went to Coliseum Apartments to purchase some marijuana from a mutual friend, Javon Burnett. When they arrived, Burnett met them at the car, engaged in friendly conversation, and gave them the marijuana. After receiving the

marijuana, they left; Smiley was dropped off at his apartment, and Vaughn and McNair went to Vaughn's mother's house.

Around 1:00 a.m. on April 1, Vaughn and McNair returned to Smiley's apartment. Vaughn had his Glock nine-millimeter handgun with an extended magazine which allowed the handgun to carry thirty bullets, including one in the chamber. The three smoked marijuana and later fell asleep. Vaughn went to sleep with his handgun on his lap. Smiley woke up around 8:00 a.m. and heard McNair arguing on the phone with the mother of his children, Tierra Smith. Vaughn was still asleep with his handgun on his lap. When McNair got off the phone, he was very upset and told Smiley, "Let's go get some weed." Although Smiley had marijuana, McNair insisted they get some from Burnett.

Smiley contacted Burnett and they agreed to meet at Coliseum Apartments. Before leaving Smiley's apartment, McNair grabbed the handgun from the still-sleeping Vaughn's lap. Smiley drove the silver Sonata with McNair as the passenger. When they arrived at Coliseum Apartments, Burnett was not there yet. While they were waiting, McNair told Smiley that "some stripper females overheard [that Burnett] was supposed to kill [them] for somebody else."

Smiley did not believe McNair even though McNair said, "he was for real." McNair told Smiley to open the trunk and then walked to the back of the car. Smiley thought he was "grabbing something out" of the trunk but was not sure. Smiley remained in the car, playing on his phone. Shortly after McNair exited the car, Smiley looked up and saw a black car leaving the area. Triana Derrick, Burnett's girlfriend, owned a black car and testified that she had dropped Burnett off at Coliseum Apartments that morning.

After the black car pulled away, Smiley saw McNair come from the back of the car, leaving the trunk open, and run between two apartment buildings. Smiley heard multiple gunshots and approximately thirty to sixty seconds later, McNair came running back to the silver Sonata. McNair closed the trunk, entered the passenger side of the car, and told Smiley to drive, directing him to Smith's house. When asked at trial if he "pretty well [knew] what happened at that point," Smiley agreed. While driving to Smith's house, McNair was "panicking" because he could not find his phone and began using Smiley's. Before arriving, McNair unloaded approximately thirteen bullets from Vaughn's handgun and threw them out the window. When they arrived at Smith's, McNair took a shower and then McNair and Smiley drove back to Smiley's apartment in Smith's car, leaving the silver Sonata at her house. Smiley saw McNair

with the handgun as the two went back to Smiley's place; Smiley went inside where Vaughn was still sleeping but McNair drove away. He later returned to Smiley's and told Vaughn that the rental car and his handgun were both "gone."

At approximately 10:00 that morning, shortly after dropping Burnett off at Coliseum Apartments, Derrick called Burnett's cell phone. Burnett's friend Shawn answered, and Derrick heard "people yelling and screaming in the background[.]" Because "nobody was really saying anything," Derrick hung up and called back. Shawn again answered and said, "They just killed [Burnett]." Corryna Bear, a resident of Coliseum Apartments, testified that as she was getting ready for breakfast, she heard what she thought were "very, very loud knocks at the window ... unusually loud." She went to the window where she saw an "African-American male," who was "taller with broad shoulders," run from the side of her building to a car. Bear described the car as "a light color, white, silver" with tinted windows. She noticed that the trunk was open and that the man threw something in the trunk before getting in the passenger side. After the car left, Bear and her boyfriend heard screaming and went outside where they saw a body face-down on the ground on the same side of the building Bear had seen the man run from; Bear called the police.

Officers of the Fort Wayne Police Department ("FWPD") were dispatched to the scene and, upon arrival, they observed a male with gunshot wounds to the head, who they later identified as Burnett. Burnett died from thirteen gunshot wounds. FWPD Detective Jeff Marse found a cell phone on the ground in the parking lot area of Coliseum Apartments. It was later confirmed that the cell phone belonged to McNair.

On July 6, 2018, the State charged McNair with murder and use of a firearm during the commission of a felony.

* * *

McNair's jury trial commenced on January 8, 2019.

* * *

The jury found McNair guilty as charged. The trial court entered judgment of conviction for murder and using a firearm in the commission of a felony and sentenced McNair to serve eighty-five years in the DOC.

ECF 6-6 at 2-9; *McNair v. State*, 147 N.E.3d 1053 (Ind. Ct. App. 2020).

On September 30, 2020, the Indiana Court of Appeals certified its opinion affirming McNair's conviction and sentence. ECF 6-2 at 14. On December 4, 2020, McNair initiated post-conviction proceedings, which culminated in the Allen Superior Court's denial of the petition on August 26, 2021. ECF 6-8 at 2-3. On February 14, 2022, McNair attempted to appeal the post-conviction decision, but the Indiana Court of Appeals summarily dismissed the appeal as untimely. ECF 6-12.

On January 11, 2023, McNair initiated this habeas case by filing a petition.[1] ECF 1. In the petition, McNair asserts that he is entitled to habeas relief due to insufficient evidence to support the conviction, trial court error, ineffective assistance of trial counsel, and prosecutorial misconduct. He also asserts a freestanding claim of actual innocence. While actual innocence may be a basis to excuse procedural deficiencies, federal courts have not recognized actual innocence as an independent basis for habeas relief. *Herrera v. Collins*, 506 U.S. 390, 404–05 (1993); *Tabb v. Christianson*, 855 F.3d 757, 764 (7th Cir. 2017). Consequently, the court declines to further consider the assertion of actual innocence as a freestanding claim.

TIMELINESS

The Warden argues that the petition is untimely. The statute of limitations for habeas corpus cases is set forth in 28 U.S.C. § 2244(d), which provides:

---

[1] Here, the court credits the attestation in the petition that McNair placed the petition in the prison mailbox on this date. ECF 1 at 15.

4

    (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--

        (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

        (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

        (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

        (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

    (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Based upon review of the record, the limitations period began to run in this case from the date on which the judgment became final pursuant to Section 2254(d)(1)(A). On September 30, 2020, the Indiana Court of Appeals certified its opinion affirming the conviction and sentence on direct appeal when McNair did not file a timely petition to transfer, so the conviction became final on that date. *See* Ind. R. App. 57(C) (petition for transfer must be filed within forty-five days). Sixty-five days later, on December 4, 2020, McNair initiated post-conviction proceedings, and, on August 26, 2021, the Allen Superior Court's denied the petition. The post-conviction petition remained pending

until it "achieved final resolution through the State's post-conviction procedures." *Carey v. Saffold*, 536 U.S. 214, 220 (2002). According to the Indiana Court of Appeals, the appeal of the post-conviction decision was untimely because the notice of appeal was due by December 8, 2021. ECF 6-12. The limitations period expired three hundred days later on October 4, 2022. McNair did not file the habeas petition until January 11, 2023, so the habeas petition is untimely.

### Equitable Tolling

McNair argues that he is entitled to equitable tolling because he diligently, though unsuccessfully, attempted to petition the Indiana Supreme Court for transfer on direct appeal and to appeal the post-conviction decision to the Indiana Court of Appeals and the Indiana Supreme Court. He explains that he was unable to do so because his legal documents were destroyed in a fire, because he received late notice of State court decisions, and because he did not have access to State legal materials at the federal prison at which he resides.

"[A] petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010). Petitioners must show reasonable diligence in pursuing their rights throughout the federal limitations period and until the date the habeas petition is filed. *Carpenter v. Douma*, 840 F.3d 867, 870 (7th Cir. 2016). "It is the petitioner's burden to establish both of these points." *Socha v. Boughton*, 763 F.3d 674, 683 (7th Cir. 2014). "Although not a chimera—

6

something that exists only in the imagination, equitable tolling is an extraordinary remedy that is rarely granted." *Carpenter*, 840 F.3d at 870.

To McNair's credit, the electronic dockets for the State courts demonstrate that he made substantial efforts to complete the appeal process on direct review and on post-conviction review. ECF 6-2; ECF 6-12; ECF 8-13; ECF 8-14. Further, it is at least plausible that the destruction of his legal documents, delayed notices, and the lack of access to State legal materials prevented him from filing a timely notice of appeal and timely petitions to transfer in State court. However, McNair offers no specific explanation as to why he could not have filed a federal habeas petition in this court prior to the expiration of the federal limitations period on October 4, 2022. To the contrary, McNair's efforts to appeal the post-conviction decision from February 2022 through October 2022 suggests that he had sufficient access to his legal documents, legal resources, and to the courts to file a federal habeas petition prior to October 4, 2022. Notably, McNair does not represent that he lacked access to federal legal materials at the federal prison at which he resides.

McNair may be implying that he could not have filed a federal petition until he completed his efforts to present his claims to each level of the State courts. However, McNair could have protected himself against the possibility that these efforts would be unsuccessful and that his habeas petition would be rendered untimely "by filing a protective petition in federal court and asking the federal court to stay and abey the federal habeas proceedings until state remedies [had been] exhausted." *See Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005). A protective petition would have been prudent as

the Indiana Court of Appeals' dismissal of the appeal signaled that the post-conviction petition was likely no longer pending and that the federal limitations period began to run again. Understandably, McNair may not have been aware of this option given that he did not have counsel on post-conviction review, but a pro se litigant's misunderstanding of the law is not an extraordinary circumstance for purposes of equitable tolling. *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions, and we decline to so hold today."); *Arrieta v. Battaglia*, 461 F.3d 861, 867 (7th Cir. 2006) ("Mistakes of law or ignorance of proper legal procedures are not extraordinary circumstances warranting invocation of the doctrine of equitable tolling."); *Williams v. Sims*, 390 F.3d 958, 963 (7th Cir. 2004) ("[E]ven reasonable mistakes of law are not a basis for equitable tolling. This is the general rule, and it has been applied repeatedly to pro se habeas corpus petitioners."). Because McNair has not demonstrated that extraordinary circumstances prevented him from filing a timely habeas petition, the doctrine of equitable tolling does not apply to excuse the untimely nature of the petition.

## Actual Innocence

McNair asserts that actual innocence excuses the untimely nature of his habeas claims. A habeas petitioner can overcome untimeliness by establishing that the court's refusal to consider an untimely claim would result in a fundamental miscarriage of justice. *McQuiggin v. Perkins*, 569 U.S. 383, 394 (2013). To meet this exception, the petitioner must establish that "a constitutional violation has resulted in the conviction

of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

"[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in

light of new evidence, it is more likely than not that no reasonable juror would have

found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 536–37

(2006). In this context, the court may consider evidence only if it is reliable and was not

presented at trial. *Gladney v. Pollard*, 799 F.3d 889, 898 (7th Cir. 2015). "The reviewing

court then considers the total record—all the evidence, old and new, incriminatory and

exculpatory—and makes a probabilistic determination about what reasonable, properly

instructed jurors would do." *Id.* "It is not the role of the court to make an independent

factual determination about what likely occurred, but rather to assess the likely impact

of the evidence on reasonable jurors." *Id.*

As new evidence, he offers: "(1) McNair doesn't match the description of murder

suspect; (2) McNair doesn't fit the description of murder suspect tinted window

Chevrolet; (3) no one identified McNair; (4) no murder weapon found; (5) no motive; (6)

McNair is using all eyewitnesses that gave a description of the murder suspect; (7)

codefendant's new statement; (8) all of this evidence gives reasonable doubt that

McNair is innocent and not guilty." ECF 17 at 33-34. Much of the purported evidence in

this list amounts to argument, commentary on the lack of evidence, or evidence that

was presented at trial, i.e., the photograph of the rental car used by McNair in the

commission of the murder. ECF 8-8 at 31-32. Nevertheless, McNair's argument

identifies two articles of evidence that appear to qualify as new evidence for purposes

of the actual innocence analysis: (1) his height of five feet, six inches, which arguably

contradicted eyewitnesses' description of him; and (2) a statement provided by Joshua Smiley recanting his trial testimony.

The court first considers the evidence adduced at trial. At trial, the prosecution presented Dr. Wagner, who testified that the victim had thirteen gunshot wounds and that he died as a result of them. ECF 8-2 at 91-105. The victim's girlfriend testified that, on April 1, 2018, she drove the victim in her black car to the Coliseum Apartments so that he could retrieve a car from a friend, Deshawn Jones. *Id.* at 106-14. After she dropped him off, he called her at 10:01 a.m. *Id.* When she tried to call him back at 10:07, Jones answered and told her that the victim had been killed. *Id.*

Corryna Bear, a resident at the Coliseum Apartments, testified that she heard loud knocks and screaming at the window. *Id.* at 117-23. When she looked through the window, she saw an African American male run from the side of her building to a light-colored car, white or silver. *Id.* She saw him throw an object into an open trunk, close the trunk, and get into the passenger seat. *Id.* She saw the car drive to Newport Avenue as if the occupants were in a hurry. *Id.* She and her boyfriend, Evan McPheeters, went outside and saw a body lying face-down on the ground near the side of her building from where the black male had run. *Id.* On cross-examination, Bear testified that the car windows were tinted. *Id.* at 123-25. She described the African American male as "[H]e was built, he had broader shoulders, I remember describing him as tall, taller, I believe, taller and broad shoulders." *Id.*

Evan McPheeters testified that he also heard yelling and a sound like someone banging on the windows. *Id.* at 128-30. He also saw the victim laying face-down near

the side of the building. *Id.* On cross-examination, he said he saw only a silhouette of an individual getting in on the passenger side of a car. *Id.* at 131-32. He described the individual as 5'8" but conceded that he described the individual as 5'10" at deposition. *Id.*

Baleria Casanova, another resident of the Coliseum Apartments, testified that she went to her car in the parking lot to install a child car seat. *Id.* at 132-44. She saw one car in which the driver prepared to get out but then got back in. *Id.* She saw a second car in which the occupants were arguing and one occupant was dropped off. *Id.* She described the first car as "I can't tell you what kind of car it is, I believe maybe a Chevy or a Toyota. It was kind of a grayish color" and described its windows as "kind of tinted." *Id.* She described the second car as black. *Id.* She saw an individual get out of the gray car from the passenger side. *Id.* The two individuals from the two cars were walking in the same direction. *Id.* As she went back to her apartment, she heard shots. *Id.* When she looked out the window, she saw the trunk of the gray car open and then saw the gray car leave. *Id.* Her mother arrived shortly thereafter and parked in the spot that the gray car had vacated. *Id.* She discovered a cellphone near the passenger side of her car. *Id.*

Joshua Smiley testified that he had been close friends with McNair, had known him for seven years, and had grown up with him. *Id.* at 150-80. He spent March 31, 2018, with McNair and Jabriel Vaughn driving around in a silver car. *Id.* Vaughn had rented the silver car, but McNair paid for it. *Id.* The three had met with the victim to purchase marijuana. *Id.* In the early morning on April 1, McNair and Vaughn arrived at his apartment. *Id.* Vaughn owned a 9mm Glock with an extended magazine. *Id.* When

Smiley woke up, he saw McNair awake, and McNair wanted to get more marijuana from the victim. *Id.* He and McNair left in the silver car to meet the victim at the Coliseum Apartments. *Id.*

When they arrived at the apartments, Smiley called the victim, and the victim told him not to rush him. *Id.* McNair told him that "some stripper females overheard [the victim] was supposed to kill us for somebody else" and swore on his children. *Id.* McNair asked him to open the trunk. *Id.* When McNair went to the trunk, Smiley began paying attention to his phone. *Id.* He observed a black car leaving and McNair running from the back of the silver Hyundai to the side of the building. *Id.* He heard gunshots and saw McNair run back towards the silver car, shut the trunk, and get in the passenger seat. *Id.* McNair told him to leave. *Id.* McNair gave him directions to the residence of Tierra Smith, the mother of McNair's children, and they drove through the intersection at Coliseum Boulevard and Parnell Avenue. *Id.* McNair told Smiley that he "loved" him and "didn't want nothing to happen to [him]." *Id.* McNair also told him that he had lost his phone and used Smiley's phone to make several calls. *Id.*

Before arriving at the Smith residence, McNair unloaded the gun and the clip and threw "seven to twelve" bullets out of the car window. *Id.* Smiley recognized the gun as belonging to Vaughn. *Id.* McNair went into the residence alone. *Id.* When Smiley followed him into the residence, McNair was showering. *Id.* McNair and Smiley departed in a white Malibu, leaving the silver car at the Smith residence. *Id.* He drove back to his house. McNair told him "he'd be in" but when Smiley went into his house, McNair drove off. *Id.* Later, when Vaughn asked about his gun, McNair told him, "It's

gone." *Id.* Smiley testified that he was initially charged with murdering the victim but that he pled guilty to assisting a criminal pursuant to plea agreement that required him to testify truthfully when called upon to do so. *Id.* He had not yet been sentenced. *Id.*

Jabriel Vaughn testified, in the early hours of April 1, 2018, he fell asleep at Smiley's apartment. *Id.* at 206-19. He owned a 9mm Glock with an extended magazine that could hold thirty-one bullets and had fallen asleep with it in his lap. *Id.* It was missing when he woke up at about 11:00 a.m., and McNair told him, "It was gone." *Id.* He also had a silver Hyundai Sonata, which he had rented using cash from McNair. *Id.* The car, which he identified from photographs, was also missing when he woke up, and McNair told him, "It was gone." *Id.* He left the house with McNair and Smiley in a white Malibu. *Id.* On cross-examination, Vaughn testified that he had a pending federal criminal case and testified with the hope of receiving a more lenient sentence. *Id.* at 219-33.

The crime scene technician testified that he found twenty shell casings near the side of the building where the victim's body was found. *Id.* at 247-50; ECF 8-3 at 2-13, Detective DeShaies testified that, on April 6, 2018, he went to a traffic stop where McNair, Smiley, and Vaughn were located in a white Malibu with two children and arrested. ECF 8-3 at 16-19. The police called Smith to take the children, and she arrived in a rented gray Hyundai Sonata with a prominent scuffmark on the front bumper. *Id.* Detective Martin testified that he unlocked the cellphone found in the parking lot and confirmed that it belonged to McNair. *Id.* at 22-44. A firearms expert testified that the shell casings found at the scene were all 9mm casings fired from the same gun. *Id.* at 51-

13

61. She similarly testified that the bullets found at the scene were also all fired from the same gun. *Id.* The bullets were 35-caliber and could be used in a 9mm gun. *Id.* A 9mm Glock as well as other types of guns could have used the shell casings, the bullets, and an extended magazine. *Id.*

A cellphone data expert also testified at trial and analyzed the cellphone numbers used by McNair and Smiley near the time of the murder. ECF 8-2 at 61-76; ECF 8-8 at 6-17. According to her presentation, a telephone call was made from McNair's phone at 10:54 a.m. Smiley's phone received a call from the victim at 9:52 a.m. *Id.* It made a call to the victim's phone at 9:59 a.m. *Id.* From 10:05 a.m. to 10:14 a.m., Smiley's phone made or attempted to make seven calls, including a call to Smith at 10:14 a.m. *Id.* These calls were made using cell towers that were near the Coliseum apartments. *Id.* Five calls made to and from Vaughn's cellphone occurred during the same timeframe and were made using a cell tower near Smiley's residence. *Id.*

At closing, trial counsel argued as follows:

> So [Bear] says she sees a taller individual, ladies and gentleman, and the State wants to tell you that Joshua Smiley is seven and a half feet tall and he almost hit his head walking out of a door. He's not that tall, ladies and gentlemen. He's tall, sure. I'm tall. That young man right there could never be misconstrued as being tall, never. 5'8", 5'10" says Mr. McPheeters. He's nowhere close to 5'8", and he's nowhere close to ever being called taller. I hate to say it to you, [McNair], but nobody's ever thought you were tall in your life. What do they see this taller black man doing? Running. Running away from gunfire. Do they see him pull the trigger? No. Can they even identify who he is? No.

ECF 8-3 at 84. After an hour or two of deliberation, the jury asked about McNair's height, but the trial court declined to answer as no trial evidence had mentioned

McNair's height. *Id.* at 98-100. The jury returned a guilty verdict about three hours later. *Id.*

At the post-conviction stage, McNair represented that he had new evidence, including his height and a statement from Joshua Smiley. ECF 9-9. The Allen Superior Court rejected the petition, finding that evidence of McNair's height would have been "remarkably unimpressive in creating doubt as to whether [McNair] was the person seen by Corryna Bear and Evan McPheeters" considering the unfavorable circumstances in which these individuals saw the person running from the side of the building and their lack of certainty regarding the person's height. ECF 6-11. The Allen Superior Circuit further declined to credit the statement from Smiley because McNair had not filed a copy of it. *Id.*

McNair attached to his traverse the purported letter from Smiley, which reads as follows:

> Wassup bro how everything going? I know you probably mad at me about this situation but look at what they trying to do to us. I had to do what the prosecutor wanted me to do. I couldn't get all that time knowing we ain't do nothing. I wish I could take it all back. I knew you didn't go by those apartments. They just wanted me to say that so it seemed like you did it. And plus I already told them I didn't see you with a gun anyways. This shit is crazy man. I regret it all because you didn't deserve to go away for the rest of your life for nothing, and I am sorry. I hope this don't come in between our friendship because I love you bro. You my best friend, and you were the only one there for me. If you need me to, have your lawyer get a statement from me. Let me know. I heard your kids getting big and looking just like you. You gone make it back to them. I'm gone make sure that. Again I want to say I'm sorry bro. I'm gone let them know the truth because we don't deserve this. He was our friend, and they trying to make us look like this. Tell your mom and them I said wassup, and I love them.

> Sincerely,

Yo n**** Josh.

ECF 17-1 at 6.

Even excluding Smiley's testimony, the evidence against McNair is overwhelming for three reasons: namely, the silver Hyundai, the 9mm Glock, and the cellphones. Two disinterested eyewitnesses identified the shooter as closing a trunk of a gray car, sitting in the passenger seat, and leaving the parking lot. A traffic camera recorded the silver Hyundai at a nearby intersection shortly after the shooting. Smith arrived with the silver Hyundai during McNair's arrest five days later. Vaughn identified the car as his rental car and testified that McNair and Smiley had used it. The car was missing when Vaughn woke up, and McNair told him it was gone. The 9mm Glock belonging to Vaughn was similarly missing when he woke up, and McNair told him the gun was gone. The Glock had an extended magazine and was capable of firing the twenty shell casings and bullets found at the scene and in the victim's body. The cellphone data indicated that Smiley and McNair were near the Coliseum Apartments at the time of the murder, called the victim shortly before the murder, and called Smith shortly after the murder. And McNair's cellphone was found shortly after the murder in the spot where the Hyundai Sonata had parked. Taken together, this evidence strongly suggests that McNair murdered the victim.

Considering the record as a whole, it seems very unlikely that a reasonable juror would credit Smiley's recantation. The recantation does not explain why the cellphone data placed Smiley and McNair near the Coliseum Apartments at the time of the murder and indicated that they had called the victim minutes before he was murdered.

It does not explain why Smiley's cellphone was used to call Smith shortly after the murder. It does not explain why a traffic camera recorded Vaughn's rental car at an intersection near the Coliseum Apartments shortly after the murder. It does not explain why McNair did not return to the Smiley residence with Vaughn's rental car or why it was later found in Smith's possession. It does not explain why the 9mm Glock went missing. And it does not explain why McNair's cellphone was found in the parking spot that had been recently vacated by the "gray car" with the passenger who was identified as the shooter. By contrast, Smiley's trial testimony is entirely consistent with the other trial evidence and fully accounts for all these questions. Further, Smiley is a very close friend of McNair who personally assisted the prosecution with obtaining his conviction, which suggests that he has a strong motive to fabricate a recantation on McNair's behalf.

The court also agrees with the Allen Superior Court that evidence of McNair's height is unlikely to have affected the jury's decision in finding him guilty. The disinterested eyewitnesses did not have an optimal vantage point with which to identify the shooter and saw him only in isolation during a critical situation that took place in close proximity to their homes. As a result, their descriptions of his height were vague and uncertain. Further, the jury necessarily had some awareness of McNair's height as trial counsel strongly implied that McNair measured less than five feet, eight inches, and McNair was present in the courtroom for the duration of the three-day trial. And, again, the other evidence against McNair was overwhelming.

Consequently, the court cannot find that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt even if presented with Smiley's recantation and McNair's height. The court concludes that McNair has not adequately demonstrated a claim of actual innocence. Consequently, the court denies the habeas petition because it is untimely.

Evidentiary Hearing

McNair filed a motion to set a "traverse hearing" but offers no explanation as to why he seeks such a hearing. The most apparent purpose would be to present Smiley's testimony to supplement his letter and to demonstrate McNair's actual innocence, but McNair's arguments suggest that he intends for the Smiley letter to stand on its own. Nevertheless, in an abundance of caution, the court will consider whether McNair is entitled to an evidentiary hearing for the purpose of presenting Smiley's testimony.

To obtain an evidentiary hearing, McNair must clear two significant legal hurdles. First, he must demonstrate that "such a hearing could enable [him] to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*

Second, McNair must show that he qualifies for an evidentiary hearing under 28 U.S.C. § 2254(e)(2):

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

McNair has not cleared either legal hurdle. McNair does not elaborate on what Smiley would say if called to testify. Moreover, it is difficult to imagine what Smiley could possibly say to rebut the evidence presented at trial such that no reasonable juror could find McNair guilty beyond a reasonable doubt. The sole exception is that Smiley might identify himself as the shooter, but neither McNair nor Smiley's letter indicate that Smiley is inclined to so incriminate himself. To the contrary, Smiley expressly maintains his innocence in the letter. ECF 17-1 at 6 ("I couldn't get all that time knowing we ain't do nothing.").

With respect to 28 U.S.C. § 2254(e)(2), McNair relies on no new rule of constitutional law or a factual predicate that could not have been previously discovered through due diligence. The petition for post-conviction relief demonstrates that McNair was aware of Smiley's recantation when he initiated post-conviction proceedings. ECF 6-9. Consequently, McNair must demonstrate that he did not fail to develop the factual basis of a claim in State court proceedings. *See Shinn v. Ramirez*, 142 S. Ct. 1718, 1734

(2022) ("We interpret 'fail'. . . to mean that the prisoner must be 'at fault' for the undeveloped record in state court. A prisoner is 'at fault' if he 'bears responsibility for the failure' to develop the record.").

The electronic docket for the post-conviction proceedings indicates that McNair filed only a post-conviction petition and an affidavit supporting the petition before the Allen Superior Court had denied the petition. ECF 6-8; ECF 6-9; ECF 6-10. In the post-conviction petition, McNair requested a hearing in his request for relief but did not suggest that he would present Smiley as a witness or identify any evidentiary issue that would require a hearing. ECF 6-9. The affidavit, filed a month and a half later pursuant to a briefing schedule, did not mention a hearing but instead indicated that McNair had provided all the evidence necessary to demonstrate his actual innocence. ECF 6-10. Also, McNair did not file a copy of Smiley's letter with the Allen Superior Court when his petition was pending. Consequently, the post-conviction record demonstrates that McNair did very little to develop Smiley's recantation in State court proceedings.

In sum, McNair has not shown that an evidentiary hearing would entitle him to habeas relief if his factual allegations were proven to be true, and he has not demonstrated that he did not fail to develop Smiley's recantation in State court proceedings. Therefore, McNair is not entitled to an evidentiary hearing, and the motion for a hearing is denied.[2]

---

[2] Indeed, the Warden goes one step further by arguing that 28 U.S.C. § 2254(e)(2) prohibits the court from considering the Smiley letter. To the Warden's point, the Supreme Court has held that "[the restrictions of Section 2254(e)(2)] apply a fortiori when a prisoner seeks relief based on new evidence without an evidentiary hearing." *Holland v. Jackson*, 542 U.S. 649, 653 (2004). Nevertheless, the court

<u>Recent Precedent</u>

As a final matter, the court considers *Arnold v. Dittman*, 901 F.3d 830 (7th Cir. 2018), a recent Seventh Circuit Court of Appeals case that is similar to this case in some respects. There, the petitioner had been convicted of sexual assault of a child based primarily on the testimony of the victim, who was also his son. *Id.* at 832. Three years later, the victim signed an affidavit in which he recanted his prior testimony and attested that he had falsely accused his father to complete a program under the supervision of the juvenile court, and the petitioner submitted the affidavit in tandem with a petition for post-conviction relief. *Id.* at 834. The State courts denied the petition without a hearing after finding that the affidavit did not constitute new evidence under State law because other witnesses at trial had testified about the victim's prior recantations, rendering the affidavit cumulative evidence. *Id.* at 834-35.

On federal habeas review, the petitioner's sole claim was a freestanding claim of actual innocence based on the victim's recantation. *Id.* at 835. The district court found that the petition was untimely but considered whether the actual innocence exception excused the untimeliness. *Id.* at 835-36. The district court relied on the State court analysis to determine that the petitioner had not satisfied his burden to show that "it [was] more likely than not that no reasonable juror would have convicted him in light of the new evidence" and to conclude that the actual innocence exception did not apply. *Id.*

---

considered the Smiley letter in the actual innocence analysis for the sake of completeness, and, given the denial of habeas relief, the court perceives no prejudice to the Warden.

On appeal before the Seventh Circuit, the petitioner's central argument was that the veracity of the victim's recantation had not been reviewed by any court and that an evidentiary hearing would be required to do so. *Id.* at 838. The Seventh Circuit rejected the State's argument that the petitioner could not, under any circumstances, satisfy the burden of proof required for a freestanding claim of actual innocence given that the burden of proof for such claims remains an open issue.[3] *Id.* The appellate court acknowledged that the evidentiary burden for the petitioner was high and that there were substantial reasons to question the credibility of recantations as a general matter. *Id.* at 838-40. However, it declined to find that the petitioner could not satisfy the burden of proof without the benefit of an evidentiary hearing in a case where the conviction so heavily relied on the victim's testimony that he now sought to recant. *Id.*

The Seventh Circuit further found that the district court should not have relied on the State court's characterization of the affidavit as cumulative evidence given that it was made in the context of whether the affidavit amounted to new evidence under State law rather than in the context of a credibility determination. *Id.* at 840-41. The Seventh Circuit also found that the recantation constituted new evidence under the federal

---

[3] In *Herrera v. Collins*, 506 U.S. 390 (1993), the Supreme Court assumed that "in a capital case a truly persuasive demonstration of actual innocence made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417. The Supreme Court further noted that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.* Nevertheless, to date, the Supreme Court has not yet resolved the issue of whether a freestanding claim of actual innocence is a valid basis for habeas relief or the precise burden of proof such a claim would require. *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence.").

actual innocence exception given the material difference in the persuasive force between a third party's testimony of a victim's prior inconsistent statements that the victim denied uttering and a victim's unequivocal recantation. *Id.* at 841-42. The Seventh Circuit concluded by remanding the case to the district court for an evidentiary hearing. *Id.* at 842.

Though *Arnold* bears some similarity to this case, it remains distinguishable and does not affect the disposition of this case. Most significantly, here, McNair's conviction did not rely on Smiley's testimony to the degree that Arnold's conviction relief on the victim's testimony. The other evidence relating to the silver Hyundai, the 9mm Glock, and the cellphone are incriminating to the point that the prosecution may have been able to convict McNair even without Smiley's testimony. Further, unlike the petitioner in *Arnold*, McNair did not properly request an evidentiary hearing in this court or with the Allen Superior Court during post-conviction proceedings. And the Supreme Court's recent emphasis on the importance of adhering to 28 U.S.C. § 2254(e)(2) dictates that, under these circumstances, the court has no discretion to afford McNair an evidentiary hearing. *See Shinn v. Ramirez*, 142 S. Ct. 1718, 1736 (2022) ("We have no power to redefine when a prisoner 'has failed to develop the factual basis of a claim in State court proceedings.'").

CERTIFICATE OF APPEALABILITY

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must consider whether to grant or deny a certificate of appealability. To obtain a certificate of appealability when the court dismisses a petition on procedural grounds, the petitioner

must show that reasonable jurists would find it debatable (1) whether the court was correct in its procedural ruling and (2) whether the petition states a valid claim for denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, there is no basis for finding that jurists of reason would debate the correctness of this procedural ruling, so there is no basis for encouraging McNair to proceed further in federal court.

For these reasons, the court:

(1) DISMISSES the petition (ECF 1) because the claims are untimely;

(2) DENIES Tyrion L. McNair, a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and

(3) DIRECTS the clerk to close this case.

SO ORDERED on October 3, 2023.

 s/ *Holly A. Brady*  
CHIEF JUDGE HOLLY A. BRADY  
UNITED STATES DISTRICT COURT